UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

03-40279-NMG

FILED
IN CLERK'S OFFICE

2004 MAR -1  P 1: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

WHITE - Pro Se

Appellant

v.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Appellee

On Appeal form the United States Bankruptcy Court
Western District of Massachusetts

APPELLANT'S OPENING BRIEF

## OPENING BRIEF TABLE OF CONTENTS

**CODES**     **PAGE**

Federal Rules of Bankruptcy Procedure, Rule 8001 .......................................... 1

28 U.S.C. § 158(a)(1) ........................................................ 1

11 U.S.C. § 363(m) .......................................................... 1, 3

11 U.S.C. § 363(b) .......................................................... 8, 9

**CASES**

Harold L. Bowers d/b/a HLB vs. Baystate Technologies Inc., C.A. No. 91-40079 NMG   2

Bowers v. Baystate Technologies Inc., 230 F.3d 1317 (Fed. Cir. 2003) ..................... 2

In re Lionel Corp., 722 F.2d 1063, 1069 (2d. Cir. 1983) ................................. 8

In re Montgomery-Ward Holding Corp., 242 B.R. 147, 153-154 (Bankr. D.Del. 1999) .... 8

In re W.B.Q. Partnerhips, 187 B.R. 97, 102 (Bankr. E.D. Va. 1995) ........................ 9

In re Condere Corp., 228 B.R. 615, 630 (Bankr. S.D. Miss. 1998) ........................ 9

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 (3rd Cir. 1986) .............. 9

**BRIEF HEADINGS**

JURISDICTION ............................................................................ 1

ISSUES ON APPEAL ..................................................................... 1

STANDARD OF REVIEW ............................................................... 1

STATEMENT OF CASE .................................................................. 2

HISTORY

    Appellant was in Debtor's same business and market ................................. 5

    The Debtor took measures to minimize its revenue ................................... 6

    The Stalking Horse misrepresented its motives to the Bankruptcy Court .......... 7

    There was not enough financial disclosure by the Debtor ......................... 7

ARGUMENT

    The Debtor did not exercise Good Business Judgment in expediting the sale ..... 8

    The findings of the Bankruptcy Court are obviously in error ....................... 10

CONCLUSION ............................................................................. 11

PROOF OF SERVICE

## JURISDICTION

This appeal is taken from the Bankruptcy Court's order approving the sale (Sale Order) of virtually all of the Debtor's assets[1]. Appellant is an unsecured creditor in this bankruptcy who objected to the Debtor's motion to expedite the sale of its assets[2] [3]. The Sale Order is a final and appealable order and this Court has jurisdiction to hear this appeal under the Federal Rules of Bankruptcy Procedure, Rule 8001, as provided in 28 U.S.C. § 158(a)(1).

## ISSUES ON APPEAL

Appellant contends the Bankruptcy Court abused its discretion by: (1) expediting the sale of virtually all of the Debtor's assets in lieu of a more orderly sale; (2) and by deciding NOT to continue the sale until after the copyright and injunction challenges were settled that were raised during bankruptcy; (3) and by approving the sale to a buyer who was an insider of the Debtor, and who the Bankruptcy Court found to have committed perjury on the stand, and who failed to qualify as a "good faith" buyer under 11 U.S.C. § 363(m).

## STANDARD OF REVIEW

Appellant contends that the first and second issues under appeal, regarding the Bankruptcy Court's decision to expedite the sale, should be review according to the sufficiency of the evidence standard; and the third issue, regarding approval of the sale to an insider who perjured himself, should be reviewed de novo due to the criminal nature of the perjury.

---

[1] Bankruptcy Court docket #121 - Sale Order.
[2] Bankruptcy Court docket #38 - First objection by Appellant to expediting the sale (Appealee's record).
[3] Bankruptcy Court docket #102 - Second objection by Appellant to expediting the sale.

1

## STATEMENT OF CASE

At the heart of this bankruptcy is the Debtor's attempt to avoid paying a judgment issued by this Court in Harold L. Bowers d/b/a HLB vs. Baystate Technologies Inc., C.A. No. 91-40079 NMG, and upheld on appeal in Bowers v. Baystate Technologies Inc., 230 F.3d 1317 (Fed. Cir. 2003)[4]. Instead of exercising its good business judgment by attempting to maximize the value of its assets, the Debtor attempted to scuttled its own company and then used bankruptcy to avoid paying its unsecured creditors and judgment holder. On April 13, 2001, the Debtor represented to this Court that it could pay the judgment in lieu of posting bond on appeal[5].

Instead of maximizing the value of its assets through an orderly bankruptcy sale, the Debtor chose to expedite the sale of virtually all of its assets to a preferred insider who was a 17.5% stockholder in the Debtor's company[6]. As a result, the Debtor's CEO, Robert Bean, who was also a principal owner, continued his lucrative employment[7] with the buyer after the sale[8]. The Debtor chose to expedite the sale in the face of a clouded title brought on by copyright and injunction challenges raised during bankruptcy by the judgment holder, Harold L. Bowers. Bowers filed an objection to the Debtor's motion to expedite the sale[9], asserting that the Debtor was still violating Bowers' copyright and violating an injunction issued by this Court[10] which required the Debtor to remove all similarities between the Debtor's and Bowers' software products. Appellant also filed two objections to the expedited sale, predicting that a clouded title would spoil the sale, and complaining that an expedited sale did not provide enough time to

---

[4] District Court docket item #442 in Harold L. Bowers d/b/a HLB vs. Baystate Technologies Inc., C.A. No. 91-40079 NMG
[5] District Court docket items #488 & #489 in Harold L. Bowers d/b/a HLB vs. Baystate Technologies Inc.
[6] A.A. pg. 52 : ln. 4        (B.C. docket #116, pg. 5 : ln. 4).
[7] A.A. pg. 30 : middle of page    (B.C. docket # 40, pg. 5 : mid page).
[8] A.A. pg. 62 : ln. 21 - pg. 65 : ln. 4  (B.C. docket #116, pg. 64 : ln. 21 - pg. 65 : ln. 4).
[9] B.C. docket #74 - Bowers Objection to Sale.
[10] District Court docket item #500 in Harold L. Bowers d/b/a HLB vs. Baystate Technologies Inc.

2

properly market the Debtor's assets, and that adequate financial disclosure had not been made by the Debtor in preparation of selling all of its assets[11].

Against objections filed by Appellant and Bowers, the Bankruptcy Court proceeded with the expedited sale. During the sale hearing and auction this Court intervened and temporarily granted Bowers' motion to remove the reference while the parties explored a remedy to Bowers' objection[12]. However, instead of clearing title to the Debtor's assets prior to the sale, the parties (Bowers, Debtor, both Buyers, and Unsecured Creditors Committee), and the Bankruptcy Court, agreed to hold the sale and to give Bowers the option of waiving his objection depending on the price the assets brought at auction. Predictably, this strategy failed to motivate the buyers to bid at the auction. The buyers never got the clear title or the release from Bowers prior to the sale that they needed to encourage them to bid at auction. Neither of the two buyers attending the sale entered competitive bids at the auction. Both buyers held firm to the initial offers presented in their asset purchase agreements, without raising those offers, or bidding against each other. The auction was over before it started[13]!

The chilling effect of the clouded title obviously spoiled the sale. As stated, the stalking horse did not even bid at the auction. Additionally, the winning buyer became so disingenuous at the sale as to commit perjury on stand when testifying about insider information, prompting the Bankruptcy Court to refuse to find the buyer in "good faith" under 11 U.S.C. § 363(m)[14]. When the stalking horse was recalled to the sale and given a second chance to take the assets by increasing its initial offer by a mere $100,000, from $2.5 to $2.6 million (making the stalking horse the high bidder due to $275,000 in loans provided to the estate), the stalking horse once

---

[11] A.A. pg. 75 : ln. 16 - ln. 23    (B.C. docket #244, pg. 14 : ln. 16 - ln. 23).
[12] B.C. docket # 122   - Stipulation agreeing to sale.
[13] A.A. pg. 65 : ln. 19 - pg. 66 : ln. 9 (B.C. docket #245, pg. 18 : ln. 19 - pg. 19 : ln. 9).
[14] A.A. pg. 67 : ln. 4 - ln. 13    (B.C. docket #245, pg. 48 : ln. 4 - ln. 13).

3

again declined to enter a bid[15]. As a result, assets the Debtor's thought were worth $10 million[16] only brought $2.85 million at auction[17], just enough money to pay $1.86 mil. to the single secured creditor[18], and to pay almost $1 mil. in professional fees and costs accrued during the bankruptcy[19]. However, none of the $6.5 million in unsecured debt declared by the Debtor was or will be repaid[20]. Six weeks prior to the auction, both the Debtor[21] and Creditors Committee[22] told the Bankruptcy Court that the auction would be lively and would generate a dividend for unsecured creditors. On the last day of the sale hearing the Creditors Committee told the Bankruptcy Court there would be $750,000 left for unsecured creditors when it was known that all the proceeds were consumed by other fees and costs[23].

Appellant has easily met his burden of showing that a more positive outcome would have resulted for the estate had the Bankruptcy Court prolonged the sale. Appellant has met his burden because the expedited sale was so badly spoiled that it is impossible to propose a worse outcome. At the point of the failed auction, the Bankruptcy Court should have instructed the parties to find some other means to settle the estate, like a more prolonged and orderly sale.

Throughout this case the Bankruptcy Court was hindered from properly evaluating the Debtor's good business judgment in expediting the sale due to numerous misrepresentations made to the Bankruptcy Court by the Debtor. The Debtor intentionally misrepresented to the Bankruptcy Court that an expedited sale was necessary to avoid financial hemorrhaging when in

---

[15] A.A. pg. 73 : ln. 5 - ln. 21  (B.C. docket #245, pg. 68 : ln. 5 - ln. 21).
[16] A.A. pg. 80 : ln. 17 - ln. 21  (B.C. docket #243, pg. 21 : ln. 17 - ln. 21).
[17] A.A. pg. 77 : ln. 13 - ln. 14  (B.C. docket #243, pg. 9 : ln. 13 - ln. 14)
[18] A.A. pg. 77 : ln. 14 - ln. 15  (B.C. docket #243, pg. 9 : ln. 14 - ln. 15).
[19] $411K to Debtor's counsel per court order by B.C. docket #226; $93K to Creditors Committee counsel per court order by B. C. docket #237; $63K to sales agent per court order by B.C. docket #234; $45K break up fee to stalking horse per Sale Order in B.C. docket #121, pg. 10 : pp. 5; $200K repayment of loans from stalking horse per Sale Order in B.C. docket #121, pg. 10 : pp. 5; $225K on reserve to fund appeal per Sale Order in B.C. docket #121, pg. 8 : pp. 4.
[20] A.A. pg. 34 : bottom of page (B.C. docket #41, Schedule F, pg. 11 : bottom of page).
[21] A.A. pg. 45 : ln. 12 - ln. 19   (B.C. docket #110, pg. 7 : ln. 12 - ln. 19).

4

Case 4:03-cv-40279-NMG   Document 6   Filed 03/01/2004   Page 8 of 15

fact the Debtor's revenue increased beyond predictions during the bankruptcy [24] [25] [26]. The Debtor intentionally misrepresented that it was facing imminent financial collapse in order to justify the expedited sale process. Likewise, the stalking horse misrepresented to the Bankruptcy Court that it preferred an expedited sale even though it did not bid at the auction.

Similarly, the sales agent, Schwartz Heslin Group, who was hired to advertise the assets and manage the sale also proved to be totally ineffective. Schwartz failed to bring a single buyer to the table who was not already engaged in negotiating a purchase agreement with the Debtor prior to the bankruptcy[27]. Schwartz also failed to perform any financial oversight of the Debtor, which the Bankruptcy Court relied upon[28]. Schwartz testified that it did not challenge or check the validity of any of the financial reporting submitted by the Debtor[29].

The Bankruptcy Court should have realized that it was pursuing an asset liquidation plan that was doomed from the beginning NOT to pay a dividend to unsecured creditors; while at the same time the expedited sale burdened the estate with skyrocketing costs in the way of legal and professional fees. Legal costs could have been significantly reduced and a dividend could have been paid to unsecured creditors if a more orderly sale process would have been pursued.

## HISTORY

### Appellant was in Debtor's same business and market.

Appellant is intimately knowledgeable about the Debtor's business and about the Debtor's market because Appellant was a CAD (computer aided design) software developer, just like the

---

[22] A.A. pg. 50 : ln. 4 - ln. 14      (B.C. docket #110, pg. 26 : ln. 4 - ln. 14).
[23] A.A. pg. 78 : ln. 3 - ln. 14      (B.C. docket #243, pg. 10 : ln. 3 - ln. 14).
[24] A.A. pg. 43 : ln. 20 - pg. 44 : ln. 6   (B.C. docket #110, pg. 4 : ln. 20 - pg. 5 : ln. 6).
[25] A.A. pg. 79 : ln. 1 - ln. 5      (B.C. docket #243, pg. 11 : ln. 1 - ln. 5).
[26] A.A. pg. 83 : ln. 14 - pg. 84 : ln. 11   (B.C. docket #243, pg. 26 : ln. 14 - pg. 27 : ln. 11).
[27] A.A. pg. 58 : ln. 22 - pg. 59 : ln. 7   (B.C. docket #116, pg. 34 : ln. 22 - pg. 35 : ln. 7).
[28] A.A. pg. 56 : ln. 13 - pg. 57 : ln. 5   (B.C. docket #116, pg. 14 : ln. 13 - pg. 15 : ln. 5).

5

Debtor, and Appellant sold high end CAD products to the Debtor's same customers for ten years prior to the Debtor purchasing Appellant's assets (copyrights, trademarks, products, customer lists, and source code) in 1998[30]. The Debtor paid Appellant 2.5% of the Debtor's revenue for five years prior to the Debtor declaring bankruptcy, so Appellant is informed about the Debtor's historical revenue patterns.

### The Debtor took measures to minimize its revenue.

The Debtor's pre-petition history is outlined in its motion to expedite the sale of virtually all of its assets [31]. The Debtor cites the adverse ruling in the "Bowers litigation" with its subsequent judgment as causing the Debtor to petition for bankruptcy[32]. It is noteworthy that the Debtor also cites a downturn in the manufacturing economy as a factor in declaring bankruptcy[33]. However, for the year prior to the petition date, the manufacturing economy was generally accepted to have been on the rebound, as is indicated by a rise in the Dow Jones Industrial Average[34] during the year preceding bankruptcy. This is significant because the Debtor released a major revision of its software during the bankruptcy[35][36], and the Debtor and the Debtor's dealers (value added resellers - VARS) knew revenue would increase [37][38], thus undermining the need and rationale for an expedited sale.

As a debtor in possession, the Debtor took calculated measures to minimize its revenue prior to and during bankruptcy. Historically, the Debtor knew that revenue always increases

---

[29] A.A. pg. 70 : ln. 25 - pg. 71 : ln. 4    (B.C. docket #245, pg. 65 : ln. 25 - pg. 67 : ln. 4 ).
[30] A.A. pg. 81 : ln. 23 - pg. 82 : ln. 4    (B.C. docket #243, pg. 22 : ln. 23 - pg. 23 : ln. 4).
[31] B.C. docket #25.
[32] A.A. pg. 27 : pp. 4                      (B.C. docket #25, pg. 3 : pp. 4).
[33] A.A. pg. 27 : pp. 4                      (B.C. docket #25, pg. 3 : pp. 4).
[34] The New York Stock Exchange web page at www.nyse.com shows an increase in the Dow and other major stock market indicators between 25% and 28% during 2003.
[35] A.A. pg. 60 : ln. 15 - pg. 61 : ln. 12   (B.C. docket #116, pg. 44 : ln. 15 - pg. 45 : ln. 12).
[36] A.A. pg. 86 : ln. 12 - ln. 18            (B.C. docket #243, pg. 30 : ln. 12 - ln. 18).
[37] A.A. pg. 55 : ln. 2 - ln. 18             (B.C. docket #116, pg. 13 : ln. 2 - ln. 18).
[38] A.A. pg. 37 - pg. 41                     (B.C. docket #102, Exhibit A).

after a major release of its software due to updates purchased by previous and existing users. The new release of the Debtor's software represented an entire rewrite of the Debtor's flagship product which took several years to complete, and the Debtor considered his software to be one of the most modern products in the market, incorporating the latest technology from Spatial Technologies, Honeywell, and Microsoft[39].

Good business judgment dictates that the easiest and best way to maximize revenue after a new software release is to offer a special upgrade price to customers who have let their update contracts lapse. The Debtor testified that two thirds of its revenue comes from these upgrade contracts, and that it is a common practice after a new release for the Debtor to offer a special upgrade price to customers who have let these contracts lapse; however, the Debtor admitted it did not pursue this guaranteed money making policy[40].

### The Stalking Horse misrepresented its motives to the Bankruptcy Court.

The Bankruptcy Court was also influenced to expedite the sale due to representations made by the stalking horse that it preferred a fast sale. However, the stalking horse's request for a fast sale proved to be unwarranted and disingenuous after the stalking horse declined to bid at the auction. Not only did the stalking horse have no plans to bid at the auction, the stalking horse actually withdrew its offer early on due to the clouded title, but the Debtor convinced the stalking horse to proceed in its role after threats of litigation[41].

### There was not enough financial disclosure by the Debtor.

Likewise, the Debtor never provided the kind of financial disclosure required to sell all of its assets. Appellant asked the Debtor for financial disclosure that Appellant was entitled to

---

[39] A.A. pg. 86 : ln. 12            (B.C. docket #243, pg. 30 : ln. 12 - pg. 31: ln. 7).
[40] A.A. pg. 85 : ln. 30 - pg. 86 : ln. 11  (B.C. docket #243, pg. 29 : ln. 10 - pg. 30 : ln. 11).
[41] A.A. pg. 53 : ln. 8 - ln. 23       (B.C. docket #116, pg. 9 : ln. 18 - ln. 23).

7

under the Debtor's purchase agreement with Appellant, but the Debtor refused to provide the contractually required accounting to Appellant[42].

## ARGUMENT

### The Debtor did not exercise Good Business Judgment in expediting the sale.

A debtor must present sound business reasons for selling all of its assets outside the ordinary course of business. See *In re Lionel Corp., 722 F.2d 1063, 1069 (2d. Cir. 1983)*. The *Lionel* Court established several factors that determine whether a sale under § 363(b) of the Bankruptcy Code should be approved, including: (1) the proportional value of the assets being sold to the estate as a whole; (2) the amount of time elapsed since filing; (3) the likelihood that a plan of reorganization would be confirmed; (4) the effect of the proposed disposition on a future reorganization plan; (5) whether the assets are increasing or decreasing in value. See id. At 1071. See also *In re Montgomery-Ward Holding Corp., 242 B.R. 147, 153-154 (Bankr. D.Del. 1999)*.

In our instant case, all the assets of the company were sold at a fraction of their worth[43], just eight weeks into the bankruptcy, before an alternative reorganization plan was even considered, let alone attempted, without adequate financial disclosure. This sale failed all of the criteria established by the *Lionel* Court for selling the estate's assets.

Additionally, case law provides that four factors determine the soundness of a stated business purpose for an asset sale pursuant to § 363 of the Bankruptcy code: (1) there is a sound business reason or an emergency necessitating the sale; (2) the sale is proposed in good faith; (3) there is adequate and reasonable notice of the sale to interested parties; (4) the purchase price is

---

[42] A.A. pg. 83 : ln. 6 - ln. 13     (B.C. docket #243, pg. 26 : ln. 6 - ln. 13).
[43] A.A. pg. 70 : ln. 21 - pg. 71 : ln. 16 (B.C. docket #245, pg. 63 : ln. 21 - pg. 64 : ln. 16).

...

fair and reasonable. See *In re W.B.Q. Partnerhips, 187 B.R. 97, 102 (Bankr. E.D. Va. 1995)*; see also *In re Condere Corp., 228 B.R. 615, 630 (Bankr. S.D. Miss. 1998)*.

As stated previously, the Debtor failed to show that it was running out of money. During the course of the bankruptcy the Debtor was able to run its business as usual, making payroll[44] and paying its secured lender[45], while paying its other bills as well. Resellers of the Debtor's software predicted a significant increase in sales of the Debtor's products, and indeed, the Debtor's revenue increased above expectation during the bankruptcy. There was no emergency necessitating the expedited sale of the Debtor's assets.

The expedited sale was not conducted in good faith. Good faith of the purchaser must be established by the Court when the Debtor seeks to sell is assets pursuant to § 363(b) of the Bankruptcy code. See *In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 (3rd Cir. 1986)*. The buyer committed perjury on the stand and was denied a good faith finding.

The Debtor also acted in bad faith. The Debtor's sole motive for expediting the sale was to secure employment for principals of the Debtor. Payments to insiders in the form of employment agreements casts doubt on the good faith of the sale. See *W.B.W* at 103.

It is certain that the purchase price was not fair. One accepted measure of price fairness is whether the purchase price is at least 75% of the appraised value of the assets. See *W.B.Q* at 104; see also *Abbotts Dairies* at 143. The Debtor testified it thought its assets were worth $10 million, and the investment banker conducting the sale appraised the Debtor's assets between $4 - $8 million.

By all standards, the Bankruptcy Court abused its discretion in finding that the Debtor followed good business judgment in expediting the sale of all of its assets.

---

[44] B.C. docket #47 - Order granting Debtor's request to continue paying employees.
[45] B.C. docket #69 - Order approving of cash collateral stipulation.

9

## The findings of the Bankruptcy Court are obviously in error.

The Bankruptcy Court found, "it's difficult to believe that a potential buyer would have been concerned about the Bowers objection since it would not have been forced to close unless it was resolved"[46]. However, two glaring facts present in the record contradict this finding. First, it is obvious the stalking horse was so concerned about the Bowers objection as not to bid at auction, let alone "close" afterward. The point is that the clouded title stopped the buyers from bidding, not from closing. The sale should have been continued until the title was clarified to encourage the highest bid, not to encourage the most accommodating "close". Secondly, the Bankruptcy Court forgets that the stalking horse withdrew its offer early on, citing the cloud and ongoing litigation as "concerns"[47]. It is a fact that at least one of the two buyers was chilled by the clouded title.

The Bankruptcy Court found, "Second, there's no evidence that regardless of what length of time and what efforts were made to sell the assets, that Mr. Bowers would have settled at any time earlier than he eventually settled which was during the sale hearing"[48]. This logic ignores the Herculean effort Bowers made to comply with the expedited timetable in attempting to resolve his objections. It was the Bankruptcy Court who put the parties on a collision course, packing too much litigation into too short of a time frame. No conceivably faster schedule could have been proposed to resolve the Bowers objections which would have also afforded all the parties with their due process right of adequate representation. It was certain that Bowers' objections could not have been resolved prior to the sale because the Bankruptcy Court did not provide the time. The Bankruptcy Court should have continued the sale until after the Bankruptcy Court ruled on the Bowers objection.

---

[46] A.A. pg. 87 : ln. 19 - ln. 22     (B.C. docket #243, pg. 42 : ln. 19 - ln. 22).
[47] A.A. pg. 46 : ln.  8 - pg. 49 : ln.  3  (B.C. docket #110, pg.  8 : ln.  8 - pg. 11 : ln. 3).

10

The Bankruptcy Court found, "Thirdly,...I have no evidence before me that would tend to show that a single potential bidder was chilled in its interest in the company on account of the Bowers litigation. This is simply a failure of proof."[49]. As stated above, it is a fact that the stalking horse was chilled by the Bowers litigation.

The Bankruptcy Court found, "And then finally, notwithstanding the fact that Mr. White complains that the sale was conducted in a manner, that the marketing efforts were conducted in a manner that was too short, there is absolutely no evidence from Mr. White as to what those marketing efforts ought to have been"[50]. It would seem that the dismal outcome of the sale itself is evidence that more time should have been allotted to sell virtually all the Debtor's assets. The sales agent brought no buyers to the table, and the buyers who did attend the sale either committed perjury or declined to bid. In the face of such a disastrous outcome, the Bankruptcy Court should not have approved the sale and should have dispatched the parties to find some other means to settle the estate.

## CONCLUSION

The Debtor intentionally misrepresented the need to expedite the sale of virtually all its assets and then minimized its revenue and refused to provide financial disclosure to its creditors. The stalking horse misrepresented that it was interested in an expedited sale when it was not interested in bidding at a sale at all. The buyer lied about its insider relationship with the Debtor and committed perjury on the stand. The sales agent hired to find buyers and to provide financial oversight of the Debtor found no buyers and conducted no financial oversight. The Unsecured Creditors Committee assured the Bankruptcy Court a dividend would be paid to unsecured

---

[48] A.A. pg. 87 : ln. 23 - pg. 88 : ln. 1    (B.C. docket #243, pg. 42 : ln. 23 - pg. 43 : ln. 1).
[49] A.A. pg. 88 : ln. 7 - ln. 11    (B.C. docket #243, pg. 43 : ln. 7 - ln. 11).

11

creditors when it was obvious none would be, and then continued to support every motion and strategy of the Debtor. And Appellant predicted what a disaster the parties were pursuing all along.

It was wholly inappropriate for the Bankruptcy Court to put this case on a fast track to an expedited sale. The Bankruptcy Court should have settled the Bowers objections before the Debtor's assets were sold. At the very least, after the failure of the auction to produce a good faith buyer or a realistic bid, the Bankruptcy Court should NOT have approved the sale and should have sent the parties back to negotiate a better outcome for unsecured creditors.

Appellant asks this Court to set the sale aside and to restore the rights of Appellant prior to the sale. The sale was conducted under fraud, misrepresentation, and perjury. Alternatively, Appellant asks this Court to dissolve the bankruptcy and restore the rights of Appellant and Bowers prior to the bankruptcy. The miscarriage of justice allowed by the Bankruptcy Court in forcing Bowers to accept $750,000 in exchange for his $6,000,000 judgment is grounds alone to dissolve the bankruptcy.

Respectfully submitted, on this 27th day of February, 2004,

by,

*Robert White*

Robert White - Pro se Appellant

---

[50] A.A. pg. 88 : ln. 12 - ln. 16  (B.C. docket #243, pg. 43 : ln. 12 - ln. 16).